I believe this is Mr. Iredell. Yes, Your Honor. Okay. Good morning and may it please the Court. I'd like to discuss with the Court the first issue and if I have sufficient time to touch at least upon the second. The first issue has been... Is there a gentleman here? Is this Mr. McKany next to you? Oh, yes, Your Honor. Forgive me. Is that your son? You can say it. He can say it. Oh, no, it's not my son, Your Honor. Mr. McKany is used to appearing in the District Court. That's what I thought Mr. McKany must have said with you. I beg your pardon. We didn't intend to breach... No, no, no. That's all right. No, that's okay. I should have explained. Welcome. Welcome. It was very nice. Okay. Let's start all over. Let's start the clock all over again and let's restart. Your Honor is very kind. Thank you. So the issue that I'd like to start with is the Craighead issue. This is an issue that is subject to de novo review on the issue of whether a reasonable person would have believed they were in custody and whether Miranda warnings were required to have been given before the questioning and the interrogation that took place in this case. Is that your best case, Craighead? Craighead, I think, is the leading case in the Ninth Circuit. The best case is actually the case we also cited in brief, I think, which is called Mattel-Carey, which is from the First Circuit. But Craighead is more than sufficient, I believe, for our purposes. Craighead said, of course, the test of whether somebody's in custody or a reasonable person would have believed they were in custody is the totality of the circumstances, but Craighead emphasized certain factors in its analysis, one of which is the number of agents who were present in the home and whether they were armed. The second was the person subject to restraint before or during the time of the questioning. And then third, it focused on the issue, was the person isolated at the time of the questioning? There's no question that this was a police-dominated atmosphere because it's during execution of a warrant where the agents thought that there were firearms in the home. So a certain level of force is going to be exerted as a result of that circumstance. But aren't there also really significant factual differences between this case and Craighead? For example, in Craighead, the court talked about the fact that there were multiple agencies involved and there was testimony from the defendant that he was confused as to whether the admonishment that you're free to leave was really true or not because maybe one agent didn't have the authority to speak for the other agencies. Is there any indication in this record whether it was at the time of the interrogation or during the hearing on the motion to suppress that Mr. McKinney was similarly confused? The answer to your question, Judge Nguyen, is the following. One, Your Honor is correct, that was one of the factors discussed in the Craighead case. Second, the record in this case is that the agent told Mr. McKinney, and I'm getting this from the transcript which I reviewed just last night, we are part of a task force. That's all he said about the identity of the agents. In other words, he did not say all 14 of these agents are Homeland Security investigation agents. He said we are part of a task force. And that was it. So there was, now the district court judge found, I believe contrary to the record. They all came in at the same time, didn't they? They had bulletproof vests on, they had guns drawn. Yes. A welcoming committee. I think Your Honor has actually put your finger on the gist of my argument. I acknowledge, of course, Judge Nguyen, that that is a distinction, a factual distinction. But what I'm getting at, because I want to make sure that I'm not missing anything from the record, Craighead did testify that he doubted whether the agent had the ability to speak for everyone because even though she told him that it was voluntary, he knew that there were agents from different agencies there. I'm assuming that with a declaration in the record that your client was subject to cross-examination at the motion to suppress? We elected to rest on the state of the record after the government presented its evidence. And the government didn't cross-examine him as to his declaration? No. So there was no similar testimony as to confusion? No. Actually, let me be accurate as to the state of the record.  Here are the facts as we understand them. We request a hearing. But the evidence at the hearing, the district court judge said, is the evidence that we'll control for purposes of the record. The evidence at the hearing included the transcript, which is in the record here, in which the agent merely said, we're part of a task force. We're all here as part of a task force. And on that point, that's it. So I don't believe, though, Judge Nguyen, that that is the gist of Craighead. I think the gist of Craighead is when, in this case, 14 armed agents entered into the house, 8 to 10 of them in the entry party, the welcoming committee, with guns drawn. They pulled Mr. McCain out of his room in his underwear, put him up against a wall, handcuffed him, took him downstairs in the living room in front of all the other agents who were at this time doing a protective sweep and who had all of their guns out and, according to the testimony, pointed in front of them as they went through the house. And then one of the agents came down, and the agent held his pants for him to step in while he was still handcuffed. He was then handcuffed for 15 minutes, and then at that point, the handcuffs were off. He was removed to his father's bedroom where he was permitted to use the bathroom with the door open and agent keeping careful watch. And at that point, the questioning began. The door was shut very early in the questioning, and he was alone with two agents. What's the duration of time between the entry by the officers and the beginning of the interrogation? The record shows that the entry occurred at 6.30. The interrogation ended at 7.48, and it lasted an hour and two minutes. So I have the interrogation beginning approximately 17 minutes after the entry of the agents. But he was told he was free to leave. Well, yes, yes, he was. He was told he was free to leave, and that statement came after. That statement impresses the Supreme Court. Well, the Supreme Court is changing, of course, Judge Bregman. But forgive me. Don't hold your breath. Of course. That was a frivolous remark, and I beg your pardon. No, no. But the Supreme Court, no, no. And actually, when you say that statement impresses the Supreme Court, that is one of the factors. Certainly, if the agent said, you are free to leave, that is a factor, and that's one of the four factors under Craighead. The issue is whether the shibboleth, whether the King's X statement of, well, you know you're free to leave, counts for anything when immediately before that you have the entry of the agents, the armed agents in their vests. We're talking about his Miranda rights. Yes, Your Honor. Okay. You haven't mentioned that at all. Let me mention it now. These agents had every ability. Here's the other thing. I just don't understand. I can't conceive of it. The testimony here was that this is apparently, or was at the time, I hope that it's changed, the agent's policy. That is to say they would enter in armed force, they would do these things, and, of course, they have the right to do that. Under Michigan v. Moseley, they have the right to handcuff somebody while they do the search. And for safety reasons, they have the right to do that. It's certainly to look at in determining as part of that totality of the circumstances test. Let me ask you this since your time is running short. Assuming that we don't go your way on the remaining issues but go your way on this issue, what is it that you're asking for? You want to have the statement suppressed. Your client fled in this case, so negotiated a deal with the government, right? So you're going to go back and the government will presumably then take him to trial on the remaining evidence without the statement, with no deal? We would withdraw the plea, and then the case would proceed pursuant to the conditional plea rule, which is present in Rule 11 of the Federal Rules of Criminal Procedure. If I could just say one word, though, Judge Nguyen, and that is this. From the agent's point of view, they have the right to come in, I suppose, with their guns. They have the right to do these things in the interest of safety. But that's not the issue that we have before us. The issue before us is whether those things, 14 armed people with their guns out, being grabbed out of your bed at 6.30 a.m., put against a wall, paraded in your underwear in handcuffs, seated in your own living room, permitted to use the bathroom only under the vigilance of an agent, and then questioned and told, oh, by the way, you're free to go, whether that would make a reasonable person feel they were in custody. And there's a very simple and easy answer to this. The agents can do whatever they want to do or need to do in searching the house. All they have to do is give Miranda. All they have to do is to say, now, I realize we came in at 6.30 in the morning. I understand these things, but you have the right to remain silent. Anything you say can be used against you. You have the right to an attorney. Do you understand the rights I've given you? That's all that would have been needed. The reason why they didn't give it was to trick out a statement, to use the overwhelming police domination, and that's the test. Was there police domination? You know, Miranda was decided in 1965. Yes, Your Honor. That's the year I first became a judge. And Miranda, through court decisions, has really been totally eviscerated. That's the way it is. What you're telling us, lots of cases described. Situations that are much more aggressive than what happened here, and the courts have said they're not in custody. Remember one case where they come out, the car is there, got about a dozen agents with rifles pointed at them, stopped them, and interrogated them. The ruling was they're not in custody.  That was decided about, oh, at least 30 years ago. That's where we are today. Well, except that this court also, and other courts of appeals, have also, in this context, said when these things happen in the home, the home is a special place, not only for Fourth Amendment purposes, but for Fifth Amendment purposes. We've had lots of cases where the home is more egregious than what happened here. You want to save some time for rebuttal? Yes, if I may. You're over your time, and I'll give you a minute for rebuttal. Just the one thing I wanted also to say is to remind the court of that quote from Robert Frost that Judge Bybee put in the Greg Head case, home is the place where, when you have to go there, they have to take you in. We say that's the place where, if they come out with their guns, they have to give you a Miranda. Okay, thank you. That's in a better world. May it please the court, Daniel Zip on behalf of the United States. Your Honor, at the outset of the interview in this case, Agent Wooden told Mr. McKaney, you're not under arrest, you're free to leave whenever you want. And that's just after he had been confronted by the officers, handcuffed, raided through the house, taken to the bathroom. They watched him use the bathroom. They watched him while he peed and all that. I mean, your position is that a reasonable person in that position would think that they were free to leave? There's no question that during those first 15 minutes of the security sweep, which the agents had information that this defendant had multiple weapons at his house, that during those 15 minutes when he was handcuffed, there were multiple agents with guns drawn, that was a police-dominated atmosphere. And certainly a defendant, a reasonable person, would feel that they were in custody. Not free to leave. Correct. He was in handcuffs during the first 15 minutes. And he doesn't have his pants on. Correct. Agent Wooden wasn't part of the first search team. He came in after the security sweep was done, moved Mr. McKinney into a separate bedroom of the house, and the situation significantly de-escalated at that point. Explain this to me. You know, it's not complicated to give a suspect Miranda warnings. It's easy to do. You've got a little card. You read it to him. You've got the waiver on the back. But why isn't that done? It can be done in less than a minute, 45 seconds. Your Honor, I wish the agents had in this case, but I think the question is whether he was in custody. The fact of the matter is that many times, being nice and giving the defendant, the suspect, Miranda rights, facilitates obtaining a voluntary confession. Yes, Your Honor. So it's actually a useful law enforcement tool, if used with a smile. Your Honor, in this case, I think once Agent Wooden had taken Mr. McKinney into that bedroom, told him that he was free to go, told him that he was not under arrest, there's a number of factors that separate that from what was present in Craighead. In that case, the defendant testified that he was confused as to which agencies were involved and whether that agent was actually speaking for all of them. That case was at Air Force housing, and the agents involved were Air Force investigators, Homeland Security, and the local sheriff. And the defendant testified that he didn't understand when that first agent told him he was free to go that he wouldn't be stopped or arrested by some of the other agents that were around outside. In this case, the district court made a factual finding that Agent Wooden was the lead case agent and that he spoke for the entire search team. Did he advise Mr. McKinney that he was the lead agent, that he was in charge, and that he was free to leave? He didn't say that, I am the lead agent, I speak for all of us. I'm in charge of this whole operation, and if you want to leave, be my guest. His actual words... The district court heard testimony from Agent Wooden and from three other agents involved. I don't think that he actually said, I am in charge, I speak for all of the agents here, but after hearing from the agent, the district court made the finding that this agent was in charge and that there was no confusion about who he spoke for. But Mr. McKinney didn't know that, is that right? Mr. McKinney never testified or never put in any evidence. He didn't testify, the lead agent didn't testify. I advised Mr. McKinney that I'm in charge and if you want to leave, feel free to leave. You don't have to answer any questions. He did not say that he told him, I am in charge, specifically. He showed him the warrant, he established himself. After they came in with their guns and did their security sweep, did he advise him, look, when we enter, we need to, for security purposes and for safety purposes, we need to display our guns and to search the place. And that's the only reason why we have our guns out. He did not say that, no, Your Honor. But as soon as they secured the house, though, the agents all did take off their, were they wearing flak jackets? Yes, and the court made that factual finding as well, that all of the agents took off their flak jackets. When they were wearing guns and they took off their jackets before the interrogation? Yes, that's what the court found, that all of the agents put away their weapons, took off their flak jackets, and it wouldn't then came in from outside. Were they sort of in tactical gear in addition to the flak jackets? I don't believe that's in the record, Your Honor. All that was discussed was flak jackets, yes. Remind me, Counsel, of the record. I'm doing this off of memory here, but the agents at the beginning of the interrogation told him that he could at any time stop their questioning and that he didn't have to answer their questions. But I don't recall whether he was ever told that he could leave until after the interrogation was over. Is that correct? No, that's not correct, Your Honor. At the very outset, the agents told him, you're not under arrest, you can leave whenever you want, and then talked some more about the search warrant and then circled back again and said, you are not under arrest, do you want to speak with us? In addition to the other points about him being able to stop at any time. Do you have another case in the Ninth Circuit or the Supreme Court where there is this level of police dominance during the execution of a search warrant in somebody's home where the court has found it to be non-custodial interrogation? No, Your Honor, there's not a case in this circuit with specific facts. In any circuit where there's this level of police domination in somebody's home during the execution of a warrant and the court has held it to be non-custodial? Not that I'm aware of, no, Your Honor. What is your best case? The best case? I suppose what we're doing here really is distinguishing Craighead. Both parties are arguing it, and I think it's a factual, intensive inquiry. The district court in this case heard testimony from multiple witnesses, balanced the facts, some of which, the number of agents, their armed nature way against us, and some of them, specifically the fact that he was informed that he was free to go in a calm and cooperative tone. The officers informed Mr. Craighead that he was free to leave, right? They did, but there was a number of factors that... And he wasn't handcuffed in Craighead, correct? That's correct, but in Craighead... A big factor there is multiple agencies were involved. Sorry. There was some military people involved as well. Correct, but that's one of the issues. And then he was taken to a back room, door was shut, and somebody stood guard. Right, I think the most salient fact that would undercut a reasonable person understanding an agent telling you you were free to go, in Craighead he was in a closed room with an armed agent or sheriff in a flak jacket standing behind him, physically blocking the door. And that sheriff wasn't involved in the actual interview at all. He was simply standing there silently throughout the entire time. And again, Craighead took the stand and testified that not only was he confused about whether he would be stopped by Air Force or other agents outside, he also said that he personally felt that he was restrained throughout the entirety of that interview, which took place in a... sitting on the floor and without any of the comforts of home. Here, in contrast... Well, his father left the house just as the agents were coming. Correct. And he saw the agents and he realized what was going to happen. And so he asked, could he go back in the house and awaken his son? And the answer was no. So he had to leave. That's correct. Why was that? Well, that was at the outset during the initial security sweep, and then he left to go open up his store. Okay, but they could have said to the father, well, we've got to make a security sweep, and after we do that, if things are okay, yeah, you can come in. You can talk to your son. What the district court found in this case was that there was no indication that Mr. McKinney asked for his father to be there or wanted assistance from his father. Yeah, but, you know, here he is. He's arrested. He's awakened. What's he supposed to think? Where's my father? Why isn't he in? Why didn't he come in? If he wanted his father to be there. I remember about the first week in law school, we learned about fictions in the law. We're still dealing with a lot of fiction. Did you study fictions in the law? I don't recall. So in conclusion, Your Honors. At least in Berkeley, we learned about fictions in the law. This case is factually distinguishable from Craig Head. The fact that the lead agent in charge told Mr. McKinney at the outset of the interview more than one time that you're free to leave. He wasn't restrained by anyone at the door. He didn't testify that he felt he was restrained, and there was no confusion about whether or not Agent Wooden spoke for the entire team. What was the sentence in this case? It was 72 months, I believe, Your Honor. How much? Seventy-two months. Seventy-two months. A reasonable person in that situation would not feel that they would be stopped if they tried to leave after Agent Wooden told them that they could. As to the defendant's other points, I think the scheduling error that led to the missed deadline in this case as the district court analyzed it was a technical violation under Rule 41, and the court made specific findings that there was no prejudice to the defendant and that the agents did not act with deliberate or recklessness. If we were to, and I don't know what's going to happen here, but assuming we were to reverse on the initial suppression ruling, what happens on remand? I believe... I mean, the government has a pretty good case even without his statements, correct? We do. Defense counsel indicated he would move to withdraw his plea and we would likely proceed to trial based on evidence that we have. Great. Thank you. A minute. Just a couple of things, if I could. The only statement the agent made about multiple agencies or single agencies is on page 385 of the excerpt of record. He says, We're here from the Internet Crimes Against Children Task Force. And so that's it. He never said, I'm speaking for everybody or we're all from one agency, et cetera. In fact, the task force is commonly composed of multiple agencies. With respect to his father, the issue that Judge Preggerson wrote, his father, by the way, is present here in court today. He said he wanted to see his son. He was told, no, you can't go see him, no. And then he went on his way. His son, during the course of the questioning, asked, is dad here or is he at the store? And although the transcript, for some reason, is unintelligible at this portion, it's a reasonable inference that the agent said to him he went to the store, he left for a short while. My time has expired. Thank you so much. Thank you very much. We appreciate your arguments in this matter. It's submitted at this time.
judges: Pregerson, Paez, Nguyen